UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

| | |
|---|---|
| CELEBRITY CARDS INTERNATIONAL, INC.<br><br>Plaintiff,<br><br>vs.<br><br>EARVIN JOHNSON, JR. a/k/a MAGIC JOHNSON, an individual, JUNE BUG ENTERPRISES, INC., and ONEWEST BANK, FSB,<br><br>Defendants. | CIVIL ACTION NO. |

**COMPLAINT FOR FEDERAL TRADEMARK INFRINGEMENT, CYBERSQUATTING IN VIOLATION OF 15 U.S.C. §1125(d), FALSE DESIGNATION, DESCRIPTION, AND REPRESENTATION UNDER THE LANHAM ACT, VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, COMMON LAW TRADEMARK INFRINGEMENT, COMMON LAW UNFAIR COMPETITION, INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS AND PROSPECTIVE BUSINESS RELATIONS UNDER FLORIDA COMMON LAW, AIDING AND ABETTING UNDER FLORIDA COMMON LAW, AND CIVIL CONSPIRACY UNDER FLORIDA COMMON LAW**

COMES NOW the Plaintiff, CELEBRITY CARDS INTERNATIONAL, INC. ("Plaintiff"), a Florida corporation, and complains against Defendants, EARVIN JOHNSON, JR. a/k/a MAGIC JOHNSON ("MAGIC JOHNSON", JUNE BUG ENTERPRISES, INC. ("JUNE BUG"), and ONEWEST BANK, FSB ("ONEWEST")(hereinafter MAGIC, JUNE BUG, and ONEWEST are collectively referred to as "DEFENDANTS"), and alleges as follows:

## INTRODUCTION

1. This case arises out of the premeditated and intentional acts of the Defendants Earvin "Magic" Johnson, Jr. ("Johnson"), June Bug Enterprises Inc. ("June Bug"), OneWest Bank, FSB

("OneWest"), to thwart and crush the Plaintiff's (and its predecessor's) ability to market and sell prepaid reloadable cards in spite of Plaintiff's ownership of the trademarks THE MAGIC CARD and MAGIC CASH CARD, for and in connection with the identical or similar and related services.

This began with Johnson's threats of litigation against the Plaintiff's predecessor-in-interest (who owned the trademark rights for "THE MAGIC CARD" and "MAGIC CASH CARD" and had brought Johnson on board to act as a spokesperson), should they attempt to proceed with the marketing and offering of a VISA "MAGIC CASH CARD" (even without Johnson's likeness); and, continues to today, with OneWest Bank (Johnson's current business partner for the goods and services at issue) having filed an action at the USPTO, seeking to cancel the Plaintiff's trademark registrations for "THE MAGIC CARD" for alleged non-use (though in point of fact, the mark was never out of commercial use, and to the extent that the commercial rollout was limited in scope, the limitation was solely due to the six years of litigation over Johnson and June Bug's threats).

2. Illustrative of the intentional and bad faith nature of the Defendants' actions, just days prior to the filing of the above-referenced cancellation action, Mr. Johnson and another representative of June Bug met with the Plaintiff and its principal, Reed Wallace, wherein Plaintiff identified the terms under which it would consider allowing Johnson to use the

Plaintiff's trademark, given that the arbitration and related litigation proceedings had come to a conclusion. During that meeting, Johnson said he wanted to "make [Reed Wallace] smile" with an upfront payment for use of the Plaintiff's trademark, and that he was agreeable, *inter alia*, to paying Plaintiff a percentage of revenues generated from sales of goods and services under the mark.

3. Despite these assurances from Johnson, just one week later, Johnson's business partner, OneWest, filed an action seeking to cancel the Plaintiff's trademark registrations for "THE MAGIC CARD," based on an alleged abandonment of the trademarks, predicated on non-use of the mark *during the time the Plaintiff's predecessor was embroiled in litigation with Johnson and June Bug, and after Johnson's threats to sue if the mark were to be used*.

4. Further evidencing the willful and bad faith nature of the Defendants' actions, the Defendants have begun offering and selling a competing product, "MAGICCARD," making this action necessary, to enjoin the actions of the Defendants, and to recover the substantial damages which they have caused to the Plaintiff.

5. This is an action for injunctive and other relief under the Federal Trademark Act, 15 U.S.C. § 1051, et seq. ("Lanham Act"), particularly 15 U.S.C. § § 1114(1) and 1125(a), for trademark infringement, false designation of origin, false description or representation, and related unfair competition. Plaintiff also asserts claims for violation of Florida statutory

and common law, including violations of the Florida Deceptive and Unfair Trade Practices Act, Fla.Stat. § 501.201 et. seq., Section 495.161 of the Florida Trademark Act, and for common law trademark infringement and unfair competition, intentional interference with business relations and prospective business relations.

**BACKGROUND AND HISTORY**

6. Celebrity Cards International and Magic Cards International (Plaintiff's predecessor) were founded in 2003 by its founder and President Reed Wallace ("Wallace").

7. The purpose of these companies was to license images and likenesses of celebrities for the purpose of marketing and distributing pre-paid debit cards with, *inter alia*, major credit card companies.

8. Prior to 2003, Wallace had founded a company called www.B2Safe.com and spent close to $1 Million dollars on software development of a proprietary closed-loop payment system with modules for a variety of on-line applications for processing financial transactions similar to "PayPal".

9. In 2002, Wallace met David Dearman & Emmett Dunlap, who had acquired a license from Defendant Johnson to distribute debit cards using his likeness and image.

10. Dearman & Dunlap learned of Wallace through the payments and debit card industry and contacted him to invest in the Magic Cash Card project for over a period of more than a year in 2002-

2003.

11. Ultimately Wallace ended up buying 51% of the company Global Team One, LLC (which at the time owned the agreement with Magic Johnson to use his image and likeness).

12. Shortly afterwards, Wallace & his team met with Defendant Johnson, to modify the license agreement to include Wallace's company Magic Cards International.

13. At the time, Magic Cards international planned to move ahead with the "Magic Cash Card" only to learn that David Stone, a resident of North Carolina, owned trademark registrations for the mark "The Magic Card," which Plaintiff's predecessor purchased in 2003, for $100,000.00. Defendant Johnson was aware of this transaction.

14. As such, the company now held the license for the use of Johnson's image & likeness and the trademark registrations and rights for the mark "The Magic Card".

15. The license agreement with Defendant Johnson required him to make appearances, promote the card, and be available for filming of TV commercials, among other obligations.

16. In late 2003, Wallace/Magic Cards International hired Ocean Park Productions & another production company to produce English and Spanish language TV commercials for the marketing & distribution of "The Magic Cash Card" with Magic Johnson featured in the commercials.

17. On February 24, 2004 Magic Cards International, together with Visa & WildCard Systems, had a press conference and ran 2 weeks of the English language TV commercials on Cox Cable in 6 million homes throughout the US with REVShare, a DRTV marketing company.

18. Approximately 2000 Magic Cash Cards were sold to the public through the Direct response TV Ads and "WEST" call center taking orders from the "800" number in the TV commercials.

19. Directly after the press release in February 2004 there was a takeover inside the Magic Cards International company and Wallace was forced out by Anthony De Meo and resigned as an officer and director.

20. In exchange for $1.5 Million dollars, Wallace relinquished his majority interest of the stock in Magic Cards International; resigned as an officer and director of Magic Cards International; surrendered his employment contract with Magic Cards International; and signed over The Magic Card trademark rights and registrations to Magic Cards International from the then-owner of the Mark.

21. Subsequently, Anthony De Meo/Magic Cards International was dealing with the day-to-day operations and there were delays in the card coming to market.

22. On or about June 10, 2005, a Demand for Arbitration – Caption Number JAMS Arbitration # 1220033474 - was filed by

Michael Holtz of Lavely Singer and Defendant Johnson’s lawyers sent “Cease & Desist” letters dated October 19th, 2004 to Magic Cards International, which prevented the use of the “The Magic Card” trademark in interstate commerce.

23. The arbitration and related litigation proceedings lasted for an approximate six (6) years, resulting in a judgment against Defendants Johnson and June Bug, which was subsequently appealed (and later resolved via a Confidential Settlement Agreement).

24. During that same period, Wallace’s company, Celebrity Cards International was simultaneously in litigation for “Breach of the Settlement Agreement” between Celebrity Cards International and Magic Cards International for default/non-payment, indirectly attributable to the actions of Defendants Johnson and June Bug.

25. The matter was ultimately resolved in a mediated settlement on or about September 2010, as a consequence of which the trademarks which are the subject of this Complaint were assigned to Celebrity Cards International.

26. Immediately thereafter, in early 2011, Celebrity Cards International and Wallace, contacted Defendant Johnson through acquaintances, to advise him that Celebrity Cards International had reacquired the trademarks, and suggested that they “jointly” release the card and move forward in business together.

27. One of these acquaintances met with Defendant Johnson at a media conference in early 2011, showed him a photo with Johnson

and Wallace promoting the Magic Cash Card, and Johnson said he was very interested and to "contact his brother Larry Johnson."

28. In reliance on this, and having spoken with the Defendant Johnson's brother, Larry Johnson, Celebrity Cards International and Wallace invested money, time, and resources, including attendance at payment system and banking conferences, in furtherance of the continued use of the trademarks.

29. In addition, Celebrity Cards International and Wallace had interested clients for a Visa-branded "Magic Card" debit card, regardless of Magic Johnsons' involvement, and Wallace/Celebrity cards were working to release a generic "The Magic Card" by Visa with law enforcement group The Safe Surfing Foundation (which protects children from online sexual predators), in connection with which a portion of revenue from each card would go to the law enforcement initiative.

30. Celebrity Cards International and Wallace also obtained approvals from a University National Bank Visa while incorporating design & use of "The Magic Card" trademark for the "Visa Magic Card" pre-paid debit card but delayed releasing the card as he was waiting for word from Defendant Johnson.

31. As mentioned above, on November 4, 2011, Wallace attended a meeting with Defendant Johnson to determine the relationship moving forward with respect to the card and the use of Celebrity Cards' trademark "The Magic Card". The Defendant Johnson had

indicated interest and Wallace had received a call from Johnson's attorneys Singer & Holtz, informing Wallace that Defendant Johnson would be in touch to discuss use of the trademark.

32. Previously, in September 2011, Wallace received a call and emails from Johnson's attorneys Marty Singer and Michael Holtz advising Wallace that Johnson had inquired if it was "okay to release a card for distribution".

33. It was explained to Wallace that the lawyers had advised Johnson "that it was alright but he/Johnson needed to go through Wallace for use of the trademark."

34. At the November 4, 2011 meeting, the subject of the litigation with Magic Cards International came up, and Defendant Johnson thanked Wallace for assistance provided in connection with same. Johnson said that he wanted to "make [Reed] Wallace smile" with an upfront payment for use of the trademark, and was agreeable to the payment of some percentage based on sales of goods and services under the trademark, on the back end.

35. Wallace and Johnson then took a photo together, Wallace got a hug, and Johnson autographed a picture of himself for Wallace's son's birthday.1

---

1 Shortly before Wallace went to see Magic Johnson to work out the details of licensing the mark he was taking care of his wife who was stricken with pancreatic cancer and who died at the age of 39, leaving Wallace to raise his teenage son alone.

The passing of his wife, and the previous months of caring for her, had taken a lot out of Wallace and he was really looking forward to reconnecting with Magic, whom he had previously helped and admired.

36. As the meeting ended, Defendant Johnson said his office would be in touch the following week to go over the details.

37. The following week, Celebrity Cards International received a call from Eric Holoman, on behalf of Defendant Johnson and June Bug, offering the Plaintiff $75,000.00 for the trademark.

38. Celebrity Cards International/Wallace advised that this was inconsistent with the discussions with Defendant Johnson at the November 4, 2011 meeting. Holoman said he would speak to Defendant Johnson, and get back to Celebrity Cards International/Wallace the following week.

39. However, Celebrity Cards International and Wallace never heard back from Holoman, and the following week Defendant OneWest Bank instituted a cancellation proceeding against Celebrity Cards International at the USPTO, seeking to cancel the Plaintiff's trademark registrations for "THE MAGIC CARD".

40. Some time thereafter, a competing product bearing the Accused Mark was released commercially to the public by Defendants OneWest Bank, Johnson, and June Bug. Furthermore, the Defendant OneWest has filed applications seeking to register the marks "MAGICCARD" and "MAGIC PAYCARD," while the Defendant June Bug Enterprises has filed applications seeking to register "ONLY

---

By reason of the acts complained of herein the anticipated launching of Plaintiffs' product together with Magic Johnson (as was originally planned in 2003 ) which was to be the culmination a 20-year dream of Plaintiff, turned into a "nightmare".

MAGIC," "#ONLY MAGIC," and "MAGIC BY MAGIC JOHNSON," in connection with related and/or competing goods and services.

41. Celebrity Cards International currently has a card available to the public, which is a discount card called "The Magic Card," available at www.themagiccards.com.

## JURISDICTION AND VENUE

42. This Court has jurisdiction over this action pursuant to 28 U.S.C. § § 1331, 1338(a) and 1338(b). This Court also has jurisdiction pursuant to 15 U.S.C. § 1121 and the doctrine of supplemental jurisdiction, as set forth in 28 U.S.C. § 1367. and the state law claims stated herein form part of the same case or controversy as the claims that are subject to the Court's original jurisdiction.

43. Personal jurisdiction is established, and venue is proper under 28 U.S.C. § 1391(c), in that:

a. The Defendants are engaged in substantial and not isolated activity in the State of Florida, and in this District;

b. The Defendants have committed a tort in the State of Florida, and in this District, as described herein;

c. The Plaintiff's property which has been infringed is located in this District; and

d. the intentional acts of the Defendants alleged herein, including the willful infringement of the Plaintiff's Mark for commercial gain, carried out on web sites accessible in the Southern District of Florida, were calculated to and/or have caused injury to the Plaintiff in this District.

**THE PARTIES**

44. Plaintiff is a corporation duly organized and existing under the laws of the State of Florida, doing business in the Southern District of Florida, and having a principal address at 1901 Harrison Street, Ste. 208, Hollywood, FL 33020.

45. Defendant EARVIN JOHNSON, JR., a/k/a MAGIC JOHNSON is, upon information and belief, the President of the Defendant JUNE BUG ENTERPRISES, INC.; has the capacity to control the acts of Defendant JUNE BUG ENTERPRISES, INC.; supervises and has the ability to supervise the acts of infringement alleged against Defendant JUNE BUG ENTERPRISES, INC.; has induced, caused, and/or is a motivating force behind the infringing activity set forth herein; and has a financial interest in and/or actually participated in this infringing activity.

46. Defendant JUNE BUG ENTERPRISES, INC. is a corporation with a place of business located at 9100 Wilshire Boulevard #100W, Beverly Hills, California 90212.

47. Defendant ONEWEST BANK, FSB, is a federally chartered savings bank, with a principal place of business at 888 East Walnut Street, Pasadena, CA 91101.

**PLAINTIFF'S TRADEMARK**

48. Since long prior to the acts of the Defendants complained of herein, Plaintiff and/or its predecessors adopted and used the inherently distinctive designation and trademarks "THE MAGIC CARD" and "MAGIC CASH CARD" (collectively hereinafter "the Plaintiff's Mark").

49. The Plaintiff's Mark has been adopted and used in commerce by Plaintiff and/or its predecessors since at least as early as 1989. Such adoption and use of the Plaintiff's Mark was in interstate commerce.

50. Plaintiff is the owner of U.S. Registration No. 1,796,493 for "THE MAGIC CARD," for and in connection with promoting various services of others through the distribution of discount cards.

51. Plaintiff is also the owner of U.S. Registration No. 2,830,255 for "THE MAGIC CARD", for and in connection with MAGNETIC CODED CARDS FOR USE IN PROVIDING MULTIPLE DISCOUNT SAVINGS AND OTHER VALUE ADDED BENEFITS AND SERVICES, TRAVEL AND ENTERTAINMENT DISCOUNTS, WIRELESS TELECOMMUNICATIONS AND NEXT-GENERATION INTERNET SERVICES, USED ON A VARIETY OF PLATFORMS, INCLUDING COMPUTERS, HAND HELD COMMUNICATION DEVICES, CELL PHONES, CABLE, AND VIA INTERACTIVE

ONLINE TELEVISION AND THE INTERNET.

52. Plaintiff is also the owner, by assignment, of the rights in and to "THE MAGIC CASH CARD" trademark, used in connection with reloadable card services, and reloadable stored value cards that are magnetically encoded.

53. Since long prior to the acts of Defendants complained of herein, Plaintiff has achieved wide-spread and substantial sales, advertising, and promotion of its services under the Plaintiff's Mark throughout the United States, including the Southern District of Florida.

54. The Plaintiff's Mark has come to identify Plaintiff and its goods and services, and furthermore, to distinguish said products and services from those of others.

55. Since long prior to the acts of Defendant complained of herein, Plaintiff has expended much money, time, and effort in promoting and marketing its goods and services under the Plaintiff's Mark, such that the Plaintiff's Mark has been and is now associated in the public mind exclusively with Plaintiff.

**DEFENDANTS' UNLAWFUL ACTIVITIES**

56. Defendants are engaged in and carrying out the business of offering for sale goods or services identical or similar to the goods and services offered for sale by Plaintiff under the Plaintiff's Mark.

57. Upon information and belief, Defendants are well aware of

and, since long prior to the acts of the Defendant complained of herein, had been well aware of, the vast goodwill represented and symbolized by the Plaintiff's Mark.

58. Notwithstanding that knowledge, and indeed by reason of such knowledge, Defendants engaged in a deliberate and willful scheme to trade upon and to misappropriate the vast goodwill represented and symbolized by the Plaintiff's Mark; and, to induce or contribute to the infringement of the Plaintiff's Mark, all in willful and reckless disregard of Plaintiff's rights.

59. Specifically, Defendants have offered and promoted identical services, using confusingly similar trademarks and domain names, namely, "THE MAGIC CARD," "MAGICCARD," "ONLY MAGIC," "MAGIC BY MAGIC JOHNSON," and onlymagiccard.com (collectively referred to hereinafter as "the Accused Mark").

60. The Defendant ONEWEST BANK FSB has used the mark on its web site, located at onlymagiccard.com. Printouts demonstrating use of the Accused Mark by the Defendants, and on the Defendant OneWest Bank's web site, are attached as Exhibit A. Attached as Exhibit B are those of Plaintiffs' marks which support, in part, its continued use.

61. Defendants' aforesaid use of the Accused Mark in connection with the sale and offering for sale of the identical goods or services is designed and is calculated and is likely to to cause confusion, to cause mistake, and to deceive customers and

prospective costumers as to the origin or sponsorship of Defendants' goods or services, and to cause them to believe that Defendants' goods or services are those of Plaintiff, or are sponsored, licensed, authorized, or approved by Plaintiff, all to the detriment of Plaintiff, the trade, and the public.

62. Defendants' unauthorized acts as described herein have caused and will continue to cause irreparable damage to the business and goodwill of Plaintiff unless restrained by this Court.

63. Plaintiff has no adequate remedy at law.

**COUNT I**
**FEDERAL TRADEMARK INFRINGEMENT**
**(Against all Defendants)**

64. Plaintiff incorporates herein each and every allegation set forth in Paragraphs 1 through 63 as if fully set forth herein.

65. With full knowledge and awareness of Plaintiff's ownership and prior use of the Plaintiff's Mark, Defendants have willfully used, is using, and will continue to use a trademark that infringes upon the Plaintiff's Mark in a manner that is likely to cause confusion, or reverse confusion, and/or to cause mistake, or to deceive.

66. Defendants' acts in using the Plaintiff's Mark, or a reproduction, counterfeit, copy, or colorable imitation thereof, constitute infringement pursuant to 15 U.S.C. § 1114(1)(a).

67. Defendants' aforesaid acts have caused and will cause

great and irreparable injury to Plaintiff, and unless said acts are restrained by this Court, they will be continued and Plaintiff will continue to suffer great and irreparable injury.

68. By reason of Plaintiff's irreparable injury resulting from Defendants' aforesaid acts, Plaintiff is entitled to a preliminary and permanent injunction. Plaintiff is further entitled to recover a disgorgement of Defendants' profits, and/or actual damages in such amount as proven at trial; and, by virtue of Defendants' bad faith and intentional and willful violation of Plaintiff's rights, to treble damages, attorneys' fees, and the cost of this litigation pursuant to 15 U.S.C. § 1117.

**COUNT II**
**CYBERSQUATTING IN VIOLATION OF 15 U.S.C. §1125(d)-**
**(Against Defendant ONEWEST BANK, FSB)**

69.Plaintiff incorporates herein each and every allegation set forth in Paragraphs 1 through 63 as if fully set forth herein.

70. Defendant ONEWEST BANK, FSB, has used, and is using a domain name that is identical or confusingly similar to the Plaintiff's Mark, which was distinctive prior to the registration of the domain name.

71. Defendant had, and continues to have, a bad faith intent to profit from that mark.

**COUNT III**
**FALSE DESIGNATION, DESCRIPTION,**
**AND REPRESENTATION UNDER THE LANHAM ACT**
**(Against all Defendants)**

72. Plaintiff incorporates herein each and every allegation set forth in Paragraphs 1 through 63 as if fully set forth herein.

73. Defendants' intentional and unlawful use in commerce of the Accused Mark constitutes use in commerce of a word, term, name, symbol, or device, or a combination thereof, or a false designation of origin, false description, and false representation by Defendants including, without limitation, that Defendants and Defendants' goods and/or services are the products or services of Plaintiff, or are sponsored or approved by Plaintiff, or affiliated with Plaintiff.

74. Defendants' aforesaid acts constitute unfair competition and false designation and/or false description of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

75. Defendants' aforesaid acts have caused and will cause great and irreparable injury to Plaintiff, and unless said acts are restrained by this Court, they will be continued and Plaintiff will continue to suffer great and irreparable injury.

76. By reason of Plaintiff's irreparable injury resulting from Defendants' aforesaid acts, Plaintiff is entitled to a preliminary and permanent injunction. Plaintiff is further entitled to recover a disgorgement of Defendants' profits, and/or actual damages in such amount as proven at trial; and, by virtue of Defendants' bad faith and intentional and willful violation of Plaintiff's rights, to treble damages, attorneys' fees, and the cost of this litigation pursuant to 15 U.S.C. § 1117.

**COUNT IV**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(Against all Defendants)**

77. Plaintiff incorporates herein each and every allegation set forth in Paragraphs 1 through 63 as if fully set forth herein.

78. Defendants have committed acts of unfair competition, as defined by Fla. Stat. §§ 501.201-213, by advertising, selling, promoting and using the Accused Mark, as referenced herein.

79. Defendants' acts are likely to mislead the general public, cause confusion, mistake or deception as to the origin, source or sponsorship of Defendants' goods and services, and are likely to cause the general public to erroneously associate Defendants' goods and services as originating from Plaintiff.

80. Defendants' acts, as complained of herein, have caused irreparable injury and damage to Plaintiff, and, unless restrained, will continue to do so. Plaintiff has no adequate remedy at law.

81. Plaintiff has suffered and continued to suffer economic loss directly and proximately caused by Defendants' actions alleged herein.

**COUNT V**
**COMMON LAW TRADEMARK INFRINGEMENT**
**(Against all Defendants)**

82. Plaintiff incorporates herein each and every allegation set forth in Paragraphs 1 through 63, as if fully set forth herein.

83. Plaintiff enjoys well-established common law service mark rights in and to the Plaintiff's Mark, which rights are superior to

any rights that Defendants may claim, and has built significant goodwill in same.

84. Defendants have used, in connection with the offer or sale of similar goods or services, a term or name that is false and misleading and likely to cause confusion or cause mistake or deceive the public as to the affiliation, connection or association of Defendant with Plaintiff as to the origin, sponsorship or approval of its services or commercial activities in violation of common law.

85. Defendants' use of the Accused Mark is likely to cause confusion as to the source of its goods or services in that consumers thereof will be likely to associate or have associated such services as originating with Plaintiff, all to the detriment of Plaintiff.

86. Defendants' use of the Accused Mark violates Plaintiff's common law trademark rights and has caused and is likely to cause damage to Principal by tarnishing the valuable goodwill associated with the Plaintiff's Mark and the related goods or services.

87. Defendants' acts, as complained of herein, have caused irreparable injury and damage to Plaintiff, and, unless restrained, will continue to do so.

88. By reason of Plaintiff's irreparable injury resulting from Defendants' aforesaid acts, Plaintiff is entitled to a

preliminary and permanent injunction. Plaintiff is further entitled to recover actual damages in such amount as proven at trial and such punitive damages as the Court deems just and proper.

**COUNT VI**
**COMMON LAW UNFAIR COMPETITION**
**(Against all Defendants)**

89. Plaintiff incorporates herein each and every allegation set forth in Paragraphs 1 through 63, as if fully set forth herein.

90. Defendants' aforesaid acts constitute infringement, misappropriation, and misuse of the Plaintiff's Mark, unfair competition, palming-off and passing-off against Plaintiff and unjust enrichment of Defendant, all in violation of Plaintiff's rights at common law and under the laws of the State of Florida in accordance with Fla. Stat. § 495.161.

91. Defendants' aforesaid acts have caused and will continue to cause great and irreparable injury to Plaintiff, and unless said acts are restrained by this Court, they will be continued and Plaintiff will continue to suffer great and irreparable injury.

92. By reason of Plaintiff's irreparable injury resulting from Defendants' aforesaid acts, Plaintiff is entitled to a preliminary and permanent injunction. Plaintiff is further entitled to recover actual damages in such amount as proven at trial and such punitive damages as the Court deems just and proper.

**COUNT VII**
**INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS**
**AND PROSPECTIVE BUSINESS RELATIONS**
**UNDER FLORIDA COMMON LAW**

**(Against all Defendants)**

93. Plaintiff repeats and realleges the preceding paragraphs **as** if each were fully set forth herein.

94. Plaintiff has received numerous serious inquiries from potential investors, and customers interested in working with and developing and marketing plaintiffs debit card under its registered trademarks.

95. Defendants' infringing use of Plaintiffs registered trademark and the incessant litigation they have mounted over the mark have caused and continue to cause damage to and interfere with Plaintiff's business relations and prospective business relations, including potential sales.

96. As a result of the foregoing, plaintiff has been injured and is entitled to damages in an amount to be determined at the time of trial.

**COUNT VIII**
**AIDING AND ABETTING**
**UNDER FLORIDA COMMON LAW**
**(Against all defendants)**

97. Plaintiff repeats and realleges the preceding paragraphs as if each were fully set forth herein.

98. EARVIN JOHNSON, JR. a/k/a MAGIC and JOHNSON, an individual, JUNE BUG ENTERPRISES, INC. aided and abetted ONEWEST BANK FSB in all those actions referred to above.

99. In each of these instances of aiding and abetting, ONEWEST BANK FSB had actual knowledge of the trademark infringement, false designation of origin, false advertising, unfair competition, and trademark dilution described herein.

100. As a result of the foregoing, Plaintiff has been injured and is entitled to damages in an amount to be determined at the time of trial.

**COUNT IX**
**CIVIL CONSPIRACY**
**UNDER FLORIDA COMMON LAW**
**(Against all defendants)**

101. Plaintiff repeats and realleges the preceding paragraphs as if each were fully set forth herein.

102. There existed an agreement between the Defendants to do an unlawful act or to do a lawful act by unlawful means, as described herein.

103. As set forth in this Complaint, the Defendants made overt acts in pursuance of the conspiracy.

104. The Plaintiff has been damaged as as a result of the acts done under the conspiracy, and is entitled to damages in an amount to be determined at trial.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38, the Plaintiff hereby demands a jury trial for all issues so triable.

**REMEDIES**

**WHEREFORE**, Plaintiff prays:

A. That this Court will adjudge that the Plaintiff's Mark has been infringed, as a direct and proximate result of the willful acts of Defendants as set forth in this Complaint, in violation of Plaintiff's rights under the Lanham Act, 15 U.S.C. § 1051 et seq., and the common law of the State of Florida.

B. That this Court will adjudge that Defendant ONEWEST BANK, FSB, has violated the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), as a result of the acts set forth in this Complaint;

C. That this Court will adjudge that Defendants have competed unfairly with Plaintiff in violation of Plaintiff's rights at common law and in violation of Plaintiff's rights under the Lanham Act, 15 U.S.C. § 1125(a).

D. That this Court will adjudge that Defendants have committed acts of unfair competition, as defined by Fla. Stat. §§ 501.201-213.

E. That Defendants, and all their officers, directors, agents, servants, employees, attorneys, successors, and assigns, and all persons in active concert or participation therewith, be preliminarily and permanently enjoined and restrained:

1) From using the Accused Mark, the Plaintiff's Mark, or any trademark similar thereto, in connection with the sale of any similar, related, or unauthorized goods or the

rendering of any similar, related, or unauthorized services;

2) From using the infringing domains onlymagiccard.com, and any other domain names that are confusingly similar to the Plaintiff's Mark;

3) From using any logo, trade name, or trademark which may be calculated to falsely represent or which has the effect of falsely representing that the services or products of Defendants, or of any third parties, are sponsored by, authorized by, or in any way associated with Plaintiff;

4) From infringing the Plaintiff's Mark;

5) From otherwise unfairly competing with Plaintiff;

6) From falsely representing itself as being connected with Plaintiff, or sponsored by or associated with Plaintiff, or engaging in any act which is likely to falsely cause the trade, retailers, and/or members of the purchasing public to believe that Defendants are associated with Plaintiff;

7) From using any reproduction, counterfeit, copy or colorable imitation of the Plaintiff's Mark in connection with the publicity, promotion, sale, or advertising of goods or services sold by Defendants; and

8) From affixing, applying, annexing, or using in connection with the sale of any goods sold or services offered by Defendant, a false description or representation, including words or other symbols tending to falsely describe or

represent such goods or services as being those of Plaintiff and from offering such goods or services in commerce.

F. That Defendants be required to deliver up for destruction all goods, bottles, boxes, labels, signs, prints, packages, wrappers, receptacles, advertisements, and other written or printed material in the possession or control of Defendants which bear the Accused Mark, the Plaintiff's Mark, or any colorable imitations thereof, alone or in combination with any other word or element, or which are used in connection with the sale of infringing goods or services.

G. That Defendants be directed to file with this Court and to serve upon Plaintiff within thirty (30) days after service of the injunction issued in this action, a written report, under oath, setting forth in detail the manner of compliance with paragraphs A through F, inclusive of all subparts.

H. That Plaintiff recover the Defendants' profits and the damages of Plaintiff arising from the Defendants' acts described herein, and that the Court, pursuant to § 35 of the Lanham Act, 15 U.S.C. § 1117, enter judgment, in addition to the amount of the recovery based on profits or damages, for such sum as the Court shall find to be just, and in addition to the amount of actual damages found, such sums shall be in an amount three (3) times the amount of the actual damages found.

I. That Plaintiff have and recover, pursuant to 15 U.S.C. §

1117(d), an award of statutory damages in the amount of $100,000 per domain name that violates 15 U.S.C. § 1125(d), or in an alternate amount that the Court considers just.

J. That Plaintiff have and recover, pursuant to the laws of the State of Florida, in addition to its actual damages, punitive damages in an amount which the Court deems just and proper.

K. That Plaintiff have and recover both prejudgment and post-judgment interest on each and every damage award.

L. That Plaintiff have and recover its reasonable attorney fees incurred in this action, pursuant to § 35 of the Lanham Act, 15 U.S.C. § 1117, and/or Fla.Stat. § 501.2105.

M. That Plaintiff have and recover its taxable costs and disbursements herein, pursuant to § 35 of the Lanham Act, 15 U.S.C. § 1117, Fla.Stat. § 501.2105, and/or Fla.Stat. § 57.041.

N. That Plaintiff have other and such further relief as the Court may deem just and proper.

Dated: June 18, 2013

s/Robert Hantman
Robert J. Hantman
Florida Bar No. 0204935
Rhantman@hantmanlaw.com
**HANTMAN & ASSOCIATES**
**WWW.Hantmanlaw.com**
358 FIFTH AVENUE SUITE 1003
NEW YORK, NEW YORK 10001
Telephone: 212 684 3933
Facismile: 212 465 2192
Of Counsel Shirin Movahed
Florida Bar No. 31546
smovahed@shahadylaw.com

*Attorneys for Plaintiff*