UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case No. 1:13-cv-22197-UU

CELEBRITY CARDS INTERNATIONAL, INC.

Plaintiff,

vs.

EARVIN JOHNSON, JR. a/k/a MAGIC JOHNSON, an individual, JUNE BUG ENTERPRISES, INC., and ONEWEST BANK, FSB

Defendants.

______________________________________/

## AFFIDAVIT[1] IN OPPOSITION TO ONEWEST BANK, FSB'S MOTION TO STAY CIVIL ACTION

STATE OF FLORIDA )
) SS
COUNTY OF ____________)

BEFORE ME, the undersigned authority personally appeared, REED WALLACE, of lawful age, who after having being duly sworn upon his oath, deposes and says:

### INTRODUCTION

1. I am the President and CEO of Plaintiff Celebrity Cards International, Inc. ("CCI"), a Florida Corporation duly incorporated on April 4, 2003, and the owner of the registered trademark "The Magic Card,"[2] and which also has common law ownership of the name "Magic Cash Card."

[1] This affidavit is not intended to be exhaustive, and does not include a number of facts which would otherwise be included in response to a motion to dismiss and Plaintiff reserves all of its rights and remedies under the law.
[2] There are two federal registrations for THE MAGIC CARD, covering promotional discount cards which Plaintiff obtained in September 2010 from its predecessor-in-interest Magic Cards International, Inc. ("MCII")—Registration No. 1796493 (issued in 1993), and Registration No. 2830255 (issued in 2004).

2. Defendant OneWest Bank, FSB ("OneWest") claims ownership of the trademark "MAGICCARD," originally filed on November 9, 2011.

3. Both trademark claims relate to a prepaid debit card. The confusion between these strikingly similar names is blatantly obvious and cannot be disputed.[3]

4. I understand that Defendant OneWest is seeking to stay the present action before this Court, despite the fact that Defendant never opposed the motion to stay the Trademark Trial and Appeal Board ("TTAB") hearing when previously afforded the opportunity to do so. In fact, they were happy to stay it as long as we would agree to postpone the deposition of Magic Johnson.

5. While OneWest attempts to paint the case before the TTAB as factually ripe for a decision, no depositions have been taken, and OneWest has thwarted discovery by filing what I am told are protective orders to preclude or limit discovery directed to co-defendants June Bug Enterprises and Earvin "Magic" Johnson, Jr. ("Magic"). In any event, it was OneWest who initiated the TTAB proceedings, and it is now clear that if a stay is granted, it will be virtually impossible for CCI to remain in business as detailed hereinafter.

6. Not only is OneWest claiming that the trademark "The Magic Card" has been abandoned, but they are clearly infringing on the name and making it impossible for me to raise additional capital or stay in business. In fact, most of the companies in the payments industry believe that I am already part of Magic Johnson and OneWest Bank's "Magic Card" as they know me to be the person that rightfully owns the trademark and who originally launched the product. I have emails from Visa International directors stating they wished I had used them for

---

[3] After reviewing OneWest's website at www.onlymagiccard.com, it appears that OneWest has not made use of the MAGICCARD trademark it applied for. Instead, it has made use of CCI's trademark THE MAGIC CARD.

the card rather than Mastercard, which is the company brand on "The Magic Card" currently used by Magic Johnson and OneWest bank.

7. Upon information and belief, OneWest is engaging in delay and stall tactics due to the specious nature of their claim, and that it is OneWest's intention to prolong this litigation and make it financially unfeasible for me to continue to pursue my claim. OneWest and Magic Johnson have already had several business ventures together. Magic Johnson initially came to fame as a basketball star for the Los Angeles Lakers NBA franchise. Prior to the launch of "The Magic Card," OneWest Bank had the "Los Angeles Lakers' Card." Indeed, Magic Johnson has acquired a significant amount of wealth in becoming one of the most powerful African Americans in the United States with his private jet, and his most recent $2 Billion dollar purchase of the Los Angeles Dodgers MLB baseball franchise.

8. It is undisputed that any alleged delay or interruption in using "The Magic Card" in interstate commerce was the direct fault of Defendant Magic Johnson as proven, in part, by an October 19, 2004 cease and desist letter written by the lawyers[4] for Defendants June Bug Enterprises and Earvin Johnson, Jr, which stated the following:

> Accordingly, on behalf of our clients, we notify you that they hereby terminate the Agreement.... Consequently, all rights to distribute the Magic Cash Cards are hereby terminated and all rights to utilize the name, likeness, trademark, service mark and other indicia of our clients is terminated effective immediately. Accordingly, from and after the date hereof, you should discontinue any and all of use our client's name, trademark, service mark and/or likeness." (Attached hereto as Exhibit A).

9. Not content with the above letter, June Bug Enterprises and Magic Johnson also threatened Visa, even after Magic Cards International Inc. ("MCII") agreed to pull his face and

[4] Although the letter was prepared and signed by Donald W. Steele, Esq., it was copied to Martin Singer, Esq., Michael Holtz, Esq., and Tom Hoberman, Esq., who also represented the Defendants.

likeness off the cards and planned to proceed with the card using only the trademarks that it owned.

10. Clearly the letter and threats to CCI, MCII and Visa were based on the assumption that CCI and MCII were in breach of a contract with June Bug Enterprises and Earvin Johnson.

11. However, as attested by the attached Judgment filed May 19, 2009, it was June Bug Enterprises and Earvin Johnson that were in breach of a contract with CCI and MCII. A true and accurate copy of this Judgment is annexed hereto as Exhibit B.

12. As a direct result of the October 19, 2004 cease and desist letter, the Magic Card's use in interstate commerce was interrupted, and prevented from being used again commercially until, at the earliest, May 19, 2009. Millions of dollars were spent developing TV commercials, engaging banks, Visa, Processors, legal fees, program managers, Call centers, TV marketing companies, advertising, which all had to cease.

13. Notwithstanding these facts, Defendants now seek to capitalize on the wrongdoing of June Bug Enterprises and Magic Johnson by essentially arguing that I and/or my predecessor are to blame for the trademark's non-use. However, Defendants are the very ones that caused me to cease the use of the trademark, and then turned around and filed the abandonment action.

14. A further reason why it would be unfair and detrimental to me for this action to be stayed is that I have already spent between $3-4 million dollars from 2002 to 2013 in furtherance of the development and commercialization of the "The Magic Card" (over $300,000.00 of my personal savings, with the remainder coming from various investors and partners), and later the "Magic Cash Card," as detailed in the Complaint and as will be supplemented in the remainder of this Affidavit.

15. Since regaining control of the "The Magic Card" trademark in September 2010, I have spent over $150,000.00 on this venture, and have been in regular and continuous communication with Magic Johnson, his brother Larry Johnson, and his company Magic Johnson Entertainment, who are all aware of this action.

16. Magic Johnson and his team of lawyers cannot refute that after regaining control of the trademark in November 2010, I kept in touch with Magic, his office, and his attorneys, specifically Martin Singer and Michael Holtz of Lavely & Singer P.C. located in Beverly Hills, California.

17. Magic Johnson and his team of lawyers told me that they wanted to work with me and my Magic Card trademark to develop a prepaid debit card, which was originally developed in 2002, and which ceased to be used in interstate commerce only as a result of Magic's initiation of litigation, which he ultimately lost in my favor.

18. I copied Martin Singer ("Singer"), Magic Johnson's attorney on most if not all communications, and Singer responded back to say that Magic had contacted him to ask "if it were okay to go ahead and release The Magic Card," and that he (Singer) had advised him that it would be "as long as he worked it out with me to use the trademark," and that Magic's office would be contacting me in furtherance.

19. I sent Singer and Magic Johnson the industry information and financial projections, and openly discussed working together with them. In fact, I met with Magic in person as recently as November 4, 2011 along with Eric Holomon, President of Magic Johnson Entertainment, where we discussed plans to potentially go into business together.

20. He thanked me for my help on his arbitration against Magic Cards International, Inc. and its President and CEO Anthony DeMeo, and told me that he would "make me smile" with an

upfront payment for the use of the trademark and a small piece of the back end. In addition, we discussed my team selling the cards through our distribution channels, and also through relationships we had developed with churches, law enforcement organizations, and other large membership organizations such as Moose International, which we gained from our friendship with Sheriff Mike Brown of Bedford County, Virginia, and our support for his Safe Surfing Foundation helping to educate families and protect children from online sexual predators.

21. Then, two weeks later, Magic Johnson's partner, OneWest, filed a suit against me for abandonment of the trademark.

22. This lengthy, drawn-out process can be easily funded by the Defendants with their seemingly endless resources; however, any further delay in this proceeding will cause me and my company substantial harm. Indeed, I have had to use up all my assets, and financial resources in order to fund the legal proceedings up to this point, and it's put my business and personal life in a very difficult financial position to where I have had to close two of my three stores and I'm struggling to stay afloat presently. This combined with the fact that Magic Johnson and OneWest are marketing "The Magic Card" with Mastercard makes it very difficult to attempt a launch of another "Magic Card" and attract investors because of the confusion in the market and the lack of funds.

23. Simply stated, and as partially detailed in the Complaint filed herein and in this Affidavit, Magic Johnson was hired by my company to be a spokesperson and have use of his image and likeness for marketing pre-paid debit cards "Magic Cash Card" to the unbanked population in the United States. He was contracted to make appearances, be available for TV commercials and use of his image and likeness on the cards themselves. We met many times in the 2003-2004 time period for the purpose of doing these functions and later in 2004 after the

press release which he appeared at and spoke at, he sent the "cease and desist" letter and demanded more money than the contract stated. He proceeded to interfere with the company, lose an arbitration (in which I was his star witness and he thanked me for saving him potentially $30 Million dollars). We then met seven years later upon the return of the trademark to me/CCI and we made a deal to go into business together and then a week or so later he went public on a deal with OneWest Bank to wrongfully utilize the trademark registered to me, which has had a serious and negative effect on CCI's business.

24. The allegations contained in CCI's Complaint are clear and will be supplemented in a response to the pending motion to dismiss in the event this action is not stayed.

25. However, to afford this Court a complete record, the following are additional background facts, which lay out in detail the wrongdoing and exploitation by June Bug Enterprises and Magic Johnson, culminating with their deal with OneWest which further details why it would be unfair and unjust for this action to be stayed.

**BACKGROUND AND HISTORY**

26. In 1998, I founded a company called B2Safe.com based on the idea of having a website that would allow shoppers to buy items and products online without disclosing their personal, sensitive information. This was a joint concept derived by myself, my brother Mark Wallace (IBM Senior Systems Analyst), and Olympic swimmer Mark Spitz. Indeed, my brother Mark was Spitz's swim team manager at Indiana University under Coach "Doc" Counsilman, and after losing in the 1968 Mexico City Olympics, Mark designed a software program which helped Spitz shorten his swim times by showing what angles to enter the water and at what point to start his turns. Spitz credits my brother in Sports Illustrated Magazine with helping him win 7 gold medals at the 1972 Munich Olympics. Spitz was complaining that he didn't like giving out

his personal information on the internet when ordering goods and services and was wondering if there was a way this could be achieved without doing so. We later developed software for a closed-loop payment system, which provided an online solution for doing so.

27. From 1998 to 2002, close to $1 million was raised by friends and family to build the software for www.b2safe.com. This included investors such as Jonathan Goodson, Gilbert Brenninkmayjer, Ronn Moss, Konstantin Leviev, Dan Sarnoff, Dr. Dafna Lebow, and others helped to build working software modules by Blacksheep Technologies, Inc.

28. During this time period, I learned a great deal about the payments industry and traveled to Oklahoma with our head of IT, Roman Yoffe. While there, we both graduated from a prepaid card course taught by a pioneer in the prepaid card industry, Marvin Stadeli of "Wins America."

29. In 2002, I met with David Dearman and Emmett Dunlap, who had contracted with Magic Johnson to obtain the licensing agreement through Magic's bodyguard at the time, Oliver.

30. They asked me to invest in the company for over a year, and ultimately I agreed to buy a controlling interest. In order to do so, I had to sell my family home and launch the companies. I subsequently met with Magic Johnson, who agreed to my takeover, and we amended the original license agreement to reflect my company at the time, Magic Cards International, Inc.

31. At around the same time, I formed Celebrity Cards International, Inc., which would obtain license agreements from other celebrities to market prepaid debit cards.

32. In the process, I spoke with representatives for Shaquille O'Neal, Oscar De La Hoya, Oprah Winfrey, and other celebrities regarding possible licensing agreements.

33. Magic Cards International, Inc. had legal officers and directors such as Dan Sarnoff, Nick Rockefeller (Perkins Coie), Larry Schwitzer (former CEO Danka & Fruit of The Loom), Bob Heise, (former CTO Fruit of The Loom and EMC), Anthony DeMeo of Demeo Young McGrath, and others.

34. As we started to build the infrastructure and management team to develop "The Magic Card," our attorney David Brinkley ("Brinkley") advised us of the existence of the trademark "The Magic Card," which was owned by a David Stone in Boone, North Carolina. Brinkley further advised us that if we didn't obtain this trademark, we could lose all we invested and worked for in the marketing and distribution of "The Magic Cash Card."

35. I contacted David Stone in 2003 and ultimately traveled to Boone, North Carolina, where I presented him with a check for $100,000.00 to purchase "The Magic Card" trademark.

36. In 2003, the prepaid card industry was experiencing a period of rapid growth. The industry was emerging and, at the time, to obtain a prepaid debit card for marketing and distribution, it was necessary to have an issuing bank, processor, and program manager, in order to comply with federal banking laws, the Patriot Act, and other laws and regulations.

37. In an effort to generate publicity and interest in the cards, we produced TV commercials in both English and Spanish and spent more than $100,000.00. This included appearances from Magic Johnson, who appears in the TV commercials. These commercials were produced by Ocean Park Pictures based in Venice, California and another film production company owned by Larry Watkins Productions, which filmed several scenes and speaking lines with Magic Johnson at his office headquarters located on Wilshire Boulevard in Beverly Hills. These filming production sessions were part of Magic Johnson's contractual relationship with us.

38. I hired Barry Abbott (an authority on banking laws and regulations) of Howard Rice (now Arnold & Porter LLP) in San Francisco, California to ensure that we complied with all necessary laws and regulations. We also utilized the services of Nick Rockefeller of Perkins Coie for strategic business advice, in addition to local Florida lawyers Michael Brinkley, Ben Schiff, Ken Pollack, and others in order to assist with drafting and reviewing documents.

39. By this time, I had invested years and hundreds of thousands of dollars in this venture, and, after obtaining advice from industry experts, Anthony DeMeo ("DeMeo") was brought in for infrastructure, management, and fund raising. DeMeo put in approximately $300,000.00 and raised another $2 million from the Griffin Foundation Trust, of which he was the executor. I had also raised an additional $150,000 from my friends Richard Lipton, Konstantin Leviev and Mark Perlstein. We had meetings with investment bankers, powerful and influential people like Suzanne De Passe, former VP of Motown and the Producer of Michael Jackson's albums and the TV series Lonesome Dove. Suzanne agreed to come on the board of the company and help roll it out with her influential contacts and resources. Nick Rockefeller, Esq of Perkins Coie in Santa Monica was a long time friend and attorney for Dan Sarnoff. He also wanted to support and grow the company and was the director of RockVest Fund at that time with several billion dollars in funds. I personally brought Tony Peck (actor Gregory Peck's son), Peter Lopez, Esq. who represented celebrities and athletes, whom I hired to draft a contract for use of the image and likeness of Shaquille ONeal. Peter at that time was representing Governor Schwartzenegger, Kevin Costner, Oscar de Lay Hoya, Jennifer Lopez, Pavrotti and many of the top global celebrities. He was the former manager of The Eagles and married to Barbara Bach former TV star "Daisy" from the Dukes of Hazzard TV series. Peter also wanted to support the card. There are many others as well.

40. During this time, we met with Magic Johnson and his team on several occasions. We also hired one of his employees, Devon Watkins, at the rate of $5,000 per month in order to correspond with Magic directly on our behalf. We also worked closely with Mark Scoggins, head of Defendant June Bug Enterprises.

41. We also met with Todd Brockman, head of Visa Prepaid and Ted Dargan, head of MasterCard Prepaid. Both companies were highly interested in our venture and expressed a desire to be involved with us. These meetings took place at the Four Seasons Hotel in Beverly Hills.

42. After meetings with Visa and MasterCard, we met with Next Estate Corporation in California (now called Green Dot, one of the most well-known prepaid debit card companies). Specifically, we with CFO Mark Troughton and CEO Steve Streit.

43. We discussed partnering with them to do processing, program managing, and distribution through their network, which included Radio Shack, CVS, Walgreens, and other retail locations where the cards could be sold and re-loaded with funds.

44. We also met with Galileo Systems owners Clay and David Wilkes in Bountiful, Utah, another program manager and processor with feature-rich functionality, to discuss the partnering with their company to process the card program.

45. We also met with WildCard Systems here in Florida to discuss a potential deal that would entail WildCard issuing the cards with Bank of America and processing them for us. Wildcard Systems was the largest distributor and processor of pre-paid gift cards and the exclusive gift-card program supplier for Simon Malls. They were also the second largest employer of Microsoft Certified Programmers in the United States after Microsoft itself. As a

result of the close relationship with Bank of America, Anthony DeMeo felt they were the best back-end provider for our Magic Cash Card program.

46. We met with Symmetix Systems based in Orlando for a similar discussion as well. Symmetrix was a processor of financial transactions for financial institutions and capable of running back-end programs for pre-paid card systems as well. I also met with Paul Noblet Sr. based in Fort Lauderdale for discussions regarding back-end and distribution channels. Paul developed the largest financial transactional system in the world for Mastercard and built the rails/systems that Cirrus and Maestro currently run on.

47. I also met with Jonathan Weiner, of TSYS in New York, who built Russell Simmons' prepaid card program, the "Rush" card. Jonathan is now the head of Google Wallet & Google Payments. In fact, Russell Simmons went on the Oprah show in 2004 a few months after our press release in Century City to say "Magic's got a card" so he needed one too. However, Russell was able to get a card to market before Magic even though we had the press release several months prior. The fact of the matter was that WildCard Systems was taking a lot of time to develop the platform for the card, which caused the delays.

48. Ultimately, we decided to work with Wildcard Systems and their President, Gary Palmer. On February 24, 2004, a press event with Magic Johnson, Visa, Wildcard Systems and RevShare's Joseph Gray was organized by our head of PR, Joanne Geffen, and held in Century City.

49. Numerous celebrities came to the press event, as well as TV networks and other media outlets. During that time and as part of the release, TV commercials which we produced for over $100,000.00 (of which I have retained originals, in both English and Spanish with Magic Johnson) were aired on TV in the Los Angeles region and in 6 million homes across the

US on COX Cable Network through an agreement with Joseph Gray and RevShare, a DRTV marketing group.

50. West Call Center handled all of the orders.

51. Over 2000 Magic Cash Cards were sold across the nation as a result of a 2-week marketing program/test launch.

52. Shortly after the February 24th press event in Century City, there was an internal struggle at MCII between myself and Anthony DeMeo, which ultimately resulted in my resigning as President of the company and giving up my employment agreement and majority ownership. The main reasons for the dispute was that DeMeo wanted control of the entire company, I was not happy with his choice to use Wildcard Systems, and his objections to having Suzanne Depasse's involvement as well as others I had brought to the table. I wanted to use Next Estate for the back-end banking partner as they already had the available technology to launch the card, as well as retail distribution channels to go directly to market.

53. As part of a settlement agreement with MCII, I received $1.5 million dollars and assigned the trademark "The Magic Card" to MCII from my other company CCI.

54. After my departure from the MCII, I moved in another direction and began managing celebrity athletes while still holding a minority interest in MCII. After expending years of work and effort, as well as countless resources, I was obviously interested in knowing how the company I had invested so much in was doing.

55. I learned later that Magic had sent a cease and desist letter to DeMeo, and that the card was not going to be released due to pending litigation.

56. At the same time, DeMeo was in breach of the settlement agreement with me/CCI for non-payment of the $1.5 million (to be paid off at $10,000.00 per month). Payments ceased after only six months.

57. I filed an action for breach of contract in state court, Broward County, Florida. That litigation ran simultaneously with MCII/DeMeos' litigation with Magic Johnson for breach of contract, the latter of which was settled by arbitration in Santa Monica, California.

58. In 2005, after learning about the litigation between Magic Johnson and MCII, I contacted Magic Johnson's attorney Marty Singer to discuss my knowledge of the case.

59. Singer traveled to Florida to depose me shortly thereafter, and I became a star witness for Magic Johnson in his case against MCII. After learning I was the founder and developer of the company and it's technology/strategy from it's inception and had all internal knowledge, he soon realized that I would be his star witness and a large portion of his case representing Magic Johnson and JuneBug Enterprises. He was elated with my knowledge and information as well as my documentation of the internal workings of MCII.

60. Indeed, after I testified for Magic Johnson at the arbitration in Santa Monica, I became quite friendly with Marty Singer and Michael Holtz (also of Lavely & Singer P.C.). They repeatedly expressed their gratitude and appreciation for my testimony and we ultimately ended up becoming close, long-term friends.

61. At about the same time that Magic Johnson and June Bug Enterprises lost its litigation with MCII/Anthony DeMeo in California and were forced to pay out $1 million in fees and other consideration of their settlement agreement, I had regained the trademark rights for "The Magic Card" through resolution at mediation.

62. I was then contacted by Marty Singer who advised me of the settlement to be paid to MCII/DeMeo, and further advised that I should put a lien on the funds in California in order to satisfy my summary judgment.

63. In September 2010, I was able to place a lien on the funds, and subsequently, I attended mediation in Broward County, which resulted in a settlement and return of the trademark "The Magic Card" from MCII to my company, CCI.

64. Upon return of the trademark, I immediately went to work to use The Magic Card trademark. The mark was successfully transferred and registered in the name of Celebrity Cards International, Inc. with the USPTO.

65. Soon afterwards, I contacted one of the original partners in the project (Dan Sarnoff, who currently resides in California) to advise him of the trademark's return to our possession, and of my intent to put it to use and contact Magic Johnson to advise him of such and see if we could work together to develop the mark with a prepaid card. Sarnoff started working immediately and put me in touch with marketing, banking and other contacts to push the trademark forward into commerce. I told him I was educating myself on the current state of the industry, had contacted Visa and other banking companies and planned to contact Magic Johnson after I was ready to speak with Magic and his lawyers intelligently about the opportunity of re-launching a Magic Card together.

66. Sarnoff contacted a business associate, Ted Rodderick from Mercury Media, who later met with Magic Johnson at a media convention in Southern California. Rodderick brought a prior photograph of myself, Sarnoff and Magic holding a large image of the "Magic Cash Card" and advised Magic that Dan Sarnoff and I had just re-acquired "The Magic Card" trademark and

asked whether he had any interest in rolling out a new "Magic Card." Magic indicated he was very interested and directed myself and Sarnoff to contact his brother Larry Johnson to discuss.

67. During this time, I contacted Visa prepaid and many other industry players to refresh myself with the status of the industry and learn what the market was like after being away for nearly 7 years.

68. I contacted Larry Johnson and Martin Singer, and sent information and proposals to Magic Johnson/JuneBug Enterprises/Magic Johnson Entertainment with internal industry information and financial projections. Companies such as PreCash, Plastic Cash International, Merchant One, Payquicker, I2C, FIS, Fiserve and dozens of others I can provide emails, documents and contracts relating to more than 1000 emails since I immediately began to use "The Magic Card" trademark from the instant it was returned to my possession. I had over 15-20 years of experience working with payments and my home was invested in "The Magic Card" so it's not difficult to understand that I was working feverishly with most of the top companies in the payments industries across the board from the very second I was able to do so. This was my life outside of caring for my wife (and our son) during her battle with Stage 4 pancreatic cancer, which she ultimately lost a few months before I went to see Magic Johnson in Beverly Hills to offer the use of my services, the Magic Card trademark. After explaining the program to him, he agreed and offered to "make me smile" with an upfront payment. I did not ask to "smile," and all I wanted was to produce and launch a pre-paid "Magic Card" and share, in a small way, in the proceeds for creating, assisting, advising, and providing the trademark. He gave me a hug, took a photo with me, signed and autographed his proto for my son's birthday and told me the President of his company would be in touch with me next week to work everything out. The following week, I received a notice of litigation from OneWest Bank, Magic Johnson's partner, after his

President Eric Holomon called to offer me $75,000 for the trademark and nothing else. I rejected his offer and advised him that was not what Magic said and I was "not smiling."

69. I was also working with credit card processors and program managers to launch a generic "Magic Card" while waiting on discussions/negotiations with Magic Johnson, and was simultaneously working with Sheriff Mike Brown of Bedford County, Virginia to launch a "Visa Magic/Safe Surfing Card" with the intention to share revenues from card distribution to support his charity foundation, the Safe Surfing Foundation.

70. I was able to introduce Shaquille O'Neal to Sheriff Mike Brown to become the National Spokesperson for the Safe Surfing Foundation.

71. We had a ceremony on Capitol Hill with members of Congress, and Shaquille O'Neal was sworn in as a Federal Marshall and spokesperson for the Safe Surfing Foundation and the Government's ICAC (Internet Crimes Against Children) initiative.

72. We had "The Magic Card" program with the Safe Surfing logo approved by Visa, University National Bank of St. Paul, Payquicker (our program manager), and one of the nation's largest card processors. This took several months to accomplish and several thousands of dollars.

73. We held off on releasing the card until discussions with Magic Johnson came to fruition, as we did not want to compete with ourselves or upset the discussions with Magic.

74. We did launch a discount card using the mark "The Magic Card," which is available today at www.TheMagicCards.com.

75. I have more than 1000 email communications, documents, meetings, and travel records to prove my intent to use the mark as well as having met with Magic Johnson, Eric Holomon (president of Magic Johnson Entertainment) and Kevin Wynne, Esq.

76. There are emails exchanged with them and in person with Magic Johnson; in 2011, Magic thanked me for my prior testimony in his litigation with MCII, which saved him millions of dollars, and told me he wanted to work with me and the trademark.

77. He also stated he would "make me smile" with an upfront payment for use of my trademark and a small piece of the back end of The Magic Card prepaid debit card business.

78. For the foregoing reasons, I respectfully request that this court deny Defendant's motion to stay the instant action, and allow this matter to proceed.

79. I also represent the allegations in the Complaint are true and correct.

80. I further represent all exhibits attached to the Complaint and to this Affidavit are true and correct.

AFFIANT FURTHER SAYETH NAUGHT.

[signature]
Reed Wallace
President and CEO
Celebrity Cards International, Inc

STATE OF FLORIDA )
) SS
COUNTY OF Broward )

The foregoing instrument was acknowledged before me this 12 day of September, 2013 by Reed Wallace, who is personally known to me ( ) or (X) who has produced Florida Driver License as identification.

My Commission Expires:

ANNA POPPENHAGER
Notary Public - State of Florida
My Comm. Expires May 23, 2015
Commission # EE 96532
Bonded Through National Notary Assn.

[signature]
Notary Public

Printed Name: Anna Poppenhager