UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case No. 1:13-cv-22197-UU

CELEBRITY CARDS INTERNATIONAL, INC.

Plaintiff,

vs.

EARVIN JOHNSON, JR. a/k/a MAGIC JOHNSON,
an individual, JUNE BUG ENTERPRISES, INC.,
and ONEWEST BANK, FSB

Defendants.
_______________________________________/

**AFFIDAVIT OF KEVIN C. WYNNE IN OPPOSITION TO ONEWEST BANK, FSB'S MOTION TO STAY CIVIL ACTION**

BEFORE ME, the undersigned authority personally appeared, KEVIN C. WYNNE, who after having being duly sworn upon his oath, deposes and says:

1. I am the President & Chief Executive Officer of NICAL Sports & Media Group, Inc., a consulting firm I founded in 2004.

2. I have attached a copy of my biography as Exhibit "A" to my Affidavit.

3. I have reviewed Mr. Reed Wallace's Affidavit, and provide my declarations herein.

4. I have personal knowledge of the facts contained in paragraphs 17 and 18. I was present at the meeting with Defendant Earvin "Magic" Johnson, Jr. ("Magic") and Eric Holoman, President of Magic Johnson Entertainment, as an advisor to Mr. Wallace. To elaborate, we met with Mr. Holoman, and laid out the history of Mr. Wallace obtaining ownership of the mark in the first place, how Magic was initially brought into the deal and

the circumstances around Mr. Wallace's exit from Magic Cards International and his subsequent legal battle with DeMeo. Mr. Wallace also explained to Mr. Holoman his involvement in Magic's arbitration against DeMeo and how he provided critical assistance to Magic's lawyers and ultimately testified on Magic's behalf, helping to significantly reduce the judgment that was awarded against Magic. Mr. Wallace then described his thoughts on a business relationship that he was hoping would be more than a licensing deal with Magic as was previously done but actually involving both he and Magic coming together as business partners to launch the new venture. Mr. Wallace even mentioned his due diligence with bank/program managers and how far he had progressed things and that he had only been waiting to meet with Magic to gauge his interest in joining forces again before finalizing his launch plans. It was at that point in the meeting that Mr. Holoman disclosed they had already been in substantial discussions with OneWest Bank about launching a prepaid debit card program and Mr. Wallace said he was there to do business with Magic and if they wanted OneWest Bank to be the bank/program manager that he was fine with that. Mr. Wallace then proposed a business structure whereby Mr. Wallace would contribute the mark that he owned to the business and everyone would work to make the "Magic Card" venture as successful as possible. Mr. Holoman instead floated the idea of Magic buying the mark from Mr. Wallace and Mr. Wallace having no involvement in the business, which Mr. Wallace outright rejected. Mr. Wallace counter proposed Magic paying him an upfront fee to license the mark plus a royalty on the back-end and Mr. Wallace retaining use of the mark to develop his own distribution with both sides sharing in each other's success – Magic would have the majority of profits from his exploitation of the mark and Mr. Wallace would have the majority of the profits from his exploitation of the mark. Around this time, Magic joined the meeting, he and Mr. Wallace

reacquainted with each other and bonded over Mr. Wallace assisting Magic in the DeMeo arbitration. After some further surface conversation about joining forces, Magic said that he would make Mr. Wallace an offer that would "make him smile" and to give Mr. Holoman a few days to get back with an offer.

5. The following week, Mr. Wallace and I had a conference call with Mr. Holoman during which Mr. Holoman proposed a $75,000 lump sum buyout for Magic to acquire sole ownership of the mark from Mr. Wallace without any further ownership stake in the business or any royalty or profit participation. Mr. Wallace countered by saying $75,000 was an insult and we tried to convince Mr. Holoman of the merits of the dual business proposal that Mr. Wallace made in LA – namely Mr. Wallace granting Magic a perpetual license to develop a business with OneWest Bank and Mr. Wallace retaining ownership of the mark to pursue his own distribution deals with a covenant not to license the mark to any other parties. Mr. Wallace went further, stating his willingness to collaborate on how he would market, promote and distribute the mark through his distribution channels so as not to negatively impact Magic's business with OneWest Bank. After more than a 30 minute conversation, Mr. Holoman said he would discuss all of this with Magic and promised to get back to us in a few days.

6. However, instead of another call from Mr. Holoman to continue discussing a business proposition that made sense to both sides, Mr. Wallace was served with papers the following week putting him on notice that OneWest Bank had filed an abandonment proceeding with the USPTO.

7. It is my belief that Magic Johnson had already agreed to launch the Magic Card program with OneWest Bank by the time that Mr. Wallace and I met with he and Mr. Holoman on November 4, 2011.

8. I further believe that they thought there was an opportunity to acquire the mark "on the cheap" from Mr. Wallace with a $75,000 buyout, and they led Mr. Wallace along wanting him to think a better deal would be forthcoming when they immediately turned their attention to pursuing the abandonment claim with the USPTO instead of seriously considering Mr. Wallace's proposal.

9. I have personal knowledge of the facts contained in paragraphs 17, 18 and 19. I overheard Magic thank Mr. Wallace for his help in the arbitration with Magic Card International, Inc. and its President Anthony DeMeo, and further recall Magic saying he would make an offer to Mr. Wallace that would make him smile with an upfront payment for the use of the trademark Mr. Wallace owned.

10. I affirm the statement contained in paragraph 20.

11. I affirm the statement contained in paragraph 21.

12. I affirm the statements contained in paragraph 23.

13. I am aware of the facts contained in paragraph 58. I discussed legal strategies with Mr. Wallace regarding attachment of the $1 million settlement that June Bug Enterprises and Magic Johnson were required to pay under their Settlement Agreement with Magic Cards International/DeMeo when Mr. Wallace became aware of that settlement.

14. I am aware of the facts contained in paragraph 59, which I affirm are true and accurate.

15. I have personal knowledge of the facts contained in paragraph 60. Mr. Wallace approached me about working with him on using The Magic Card trademark upon reacquiring the mark from DeMeo in the fall of 2010 and I agreed to work with Mr. Wallace in establishing a business utilizing The Magic Card trademark.

16. I am aware of the facts contained in paragraph 62, which I affirm are true and accurate.

17. I am aware of the facts contained in paragraph 63, which I affirm are true and accurate.

18. I am aware of the facts contained in paragraph 66, which I affirm are true and accurate.

19. I am aware of the facts contained in paragraphs 67, 68 and 69, which I affirm are true and accurate.

20. I am aware of the facts contained in paragraph 70, which I affirm are true and accurate.

I declare the above to be true subject to penalty of perjury.

Dated: Sept. 12, 2013

Kevin C. Wynne
President and CEO
NICAL Sports & Media Group, Inc.

STATE OF VIRGINIA)
COUNTY OF FAIRFAX)

The foregoing instrument was acknowledged before me this 12th day of September, 2013 by Kevin C. Wynne, who is personally known to me ( ) or (✓) who has produced a valid state issued driver's license from the State of Virginia as identification.

Brian D. Alger
Notary Public
#251114
Commonwealth/State of Virginia, County of Fairfax
My Commission Expires: 01-31-2015

Notary Public

Printed Name: BRIAN D. ALGER

My Commission Expires: 01-31-2015